**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **MARIA L. BERRY, on behalf of JOEL ALLEN BERRY** | Case No. 1:19 CV 2472 |
| Plaintiff, | Judge Solomon Oliver, Jr. |
| v. | Magistrate Judge James R. Knepp II |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | **REPORT AND RECOMMENDATION** |

### INTRODUCTION

Plaintiff Maria L. Berry ("Plaintiff") filed a Complaint, on behalf of Joel Allen Berry ("Claimant")[1] against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated October 23, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Claimant filed for DIB in August 2017, alleging a disability onset date of July 1, 2017. (Tr. 194-95). His claims were denied initially and upon reconsideration. (Tr. 129-31, 135-37). Claimant then requested a hearing before an administrative law judge ("ALJ"). (Tr. 142-43). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on

---

1. Claimant passed away on November 12, 2018 (Tr. 647), and Plaintiff (Claimant's widow), substituted herself as a proper party in December 2018 (Tr. 188).

February 5, 2019. (Tr. 60-95). On March 25, 2019, the ALJ found Claimant not disabled in a written decision. (Tr. 16-30). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on October 23, 2019. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

      Born in December 1965, Claimant was 51 years old on his alleged onset date. *See* Tr. 194. He originally alleged disability due to partial blindness in his right eye, a painful screw in his left shoulder, dizziness, balance issues, and problem solving difficulties. *See* Tr. 218.

      Plaintiff testified at the hearing. *See* Tr. 62-94. She testified Claimant died in his sleep in November 2018 from a previously-undetected adrenal gland tumor that caused an enlarged heart. (Tr. 63-68). Plaintiff did not yet have the full autopsy results. (Tr. 90-91).

      Plaintiff testified Claimant stopped working in July 2017 due to vision issues, memory loss, confusion, tremors, fatigue, and imbalance; these progressively worsened. (Tr. 68-69, 71-72). Doctors could not figure out what caused Plaintiff's fatigue; they investigated thyroid issues, multiple sclerosis, and autoimmune disorders. (Tr. 71-72). Plaintiff testified Claimant "really had no quality of life" due to his fatigue (Tr. 72), and was depressed (Tr. 73). He slept up to seventeen hours per day. (Tr. 72, 81). Plaintiff performed all the housework. (Tr. 73).

      Claimant had a driver's license, but stopped driving about nine months prior to his death due to tremors. (Tr. 69-70). He further had difficulties with his hands and back pain. (Tr. 80-81).

2

Relevant Medical Evidence[2]

In January 2017, Claimant saw physicians at the Mellen Center for Multiple Sclerosis ("Mellen Center") for possible multiple sclerosis ("MS"). (Tr. 323-27). He reported fatigue lasting one year, a hand tremor and spasms, concentration and memory issues, slurred speech, and vision problems. (Tr. 323-24). On examination, he had normal gait, strength, reflexes, coordination, and sensation. (Tr. 325-26). He had normal speech, attention and concentration, memory, and affect. (Tr. 325). An MRI "demonstrated a questionable enhancing lesion in the posterior right optic nerve and no brain lesions." (Tr. 323); *see also* Tr. 326 (describing the MRI as "essentially normal"). Physicians noted Claimant's case was "atypical for MS due to the duration of the decline of his vision and an essentially normal MRI of his brain." (Tr. 326). They ordered a cervical spine MRI, chest x-ray, lab work, and noted Claimant should undergo a sleep study to rule out sleep apnea as the cause of his fatigue. *Id.* They diagnosed right eye optic neuropathy. *Id.*

A cervical spine MRI the following month showed degenerative changes, but a normal spinal cord. (Tr. 734-35); *see also* Tr. 320 (describing MRI as "normal").

Claimant returned to the Mellen Center in March, reporting no change in his symptoms. (Tr. 316). Specifically, he reported right eye vision blurring and his wife noted his memory and speech problems worsened at night. *Id.* He further reported severe fatigue, hypersomnia, and normal memory/concentration. *Id.* On examination, he had normal language, memory, affect, and intellectual function. *Id.* Claimant's bloodwork was negative for autoimmune diseases. (Tr. 320). Physicians assessed optic neuropathy in his right eye. *Id.* The physicians did not know the cause

---

2. Claimant alleged, and presented evidence of, both physical and mental impairments. However, although Plaintiff's brief summarizes some of the physical examination findings, she presents no argument that the ALJ's analysis thereof was incorrect, nor any specific physical restriction that she contends the ALJ failed to include in Claimant's RFC. Therefore, the undersigned summarizes only the evidence related to Claimant's mental impairments.

3

of Claimant's fatigue and dysarthria but noted his risk for developing MS was low given normal imaging. *Id.*

In July, Claimant followed up with physicians at the Mellen Center. (Tr. 313-15). He reported continuing problems with both eyes. (Tr. 313). He reported no sleep difficulty, no fatigue, and normal memory/concentration. *Id.* On examination, he had normal memory, language, intellectual function, and affect. (Tr. 314). The physicians noted Claimant's vision difficulties warranted repeat brain imaging. (Tr. 315). They further noted myasthenia gravis was worth investigating given his fatigue and other symptoms. *Id.*

In September 2017, Claimant reported no new symptoms since July and that his vision was stable. (Tr. 470). Claimant's August 2017 MRI was unchanged and "still demonstrated subtle enhancement of the right optic nerve." *Id.* He reported interrupted sleep and memory/concentration difficulties ("[t]rouble multitasking and [l]osing train of thought"). *Id.* On examination, physicians again found normal language, memory, intellectual function, and affect. (Tr. 471). They again noted Claimant's risk of MS was low and the cause of his optic neuropathy was unknown. (Tr. 472). They opined his fatigue, attention, and memory complaints were "most likely secondary to a combination of factor[s] including stress, poor sleep (untreated sleep apnea), and potential underlying attention deficits." *Id.* He was referred to "brain health for discussion of memory and attention difficulties" and told to consider a repeat sleep study and sleep apnea treatment. *Id.*

In November 2017, Claimant underwent a consultative psychological examination with Katherine Alouani, Psy.D. (Tr. 615-22). He reported memory difficulties, including forgetting his son-in-law's name and the name of a nearby hospital. (Tr. 615). His daily activities included having coffee and watching television; on bad days he did not get out of bed and on good days, he attempted to get out and do things around the house. (Tr. 616). Claimant reported completing

4

eleventh grade and later obtaining his GED. (Tr. 616-17). He described difficulty sleeping, excessive worrying, dysphoric moods, loss of energy, difficulty concentrating, irritability, and social withdrawal. (Tr. 618). He could perform activities such as driving, personal care tasks, meal preparation, cleaning, laundry, and shopping. (Tr. 618). On examination, Dr. Alouani observed Claimant had an open demeanor, appropriate social skills, normal eye contact, fluent speech, coherent and goal-direct thought content and structure, and intact attention and concentration. (Tr. 619). His affect was constricted, his mood was neutral, and his insight and judgment appeared intact. (Tr. 619-20). Dr. Alouani diagnosed unspecified depressive disorder. (Tr. 620).

In March 2018, Claimant underwent a psychological consultative examination with Mitchell Wax, Ph.D. (Tr. 625-31). Claimant reported he was unable to work due to complications from MS, which affected his vision, memory, and ability to walk. (Tr. 626). He cooked simple meals less than once per week, bathed independently, did dishes daily, laundry twice per week, and vacuumed weekly; his wife did most of the cooking and cleaning. (Tr. 627). He grocery shopped weekly with his wife and went to the corner store by himself. *Id.* On a typical day, Claimant watched television, did housework, read online, or fixed things around the house. *Id.* Claimant "made little eye contact, with one of his eyes often being half shut." (Tr. 628). He described performing mechanical work on his RV. (Tr. 628, 630). He "spoke often about his frustration due to limitations imposed by his MS." *Id.* Dr. Wax observed Claimant's speech was "at times" logical and coherent, but at other times, he "struggled for memory when responding to questions". *Id.* Dr. Wax also noted Claimant's "flow of conversation and thought was generally good", but he "intermittently" struggled with memory). *Id.* He appeared content, but also "a bit" anxious. *Id.* Dr. Wax estimated Claimant was of average intelligence. *Id.* He was able to recall six digits forward and four digits backward, as well as two of three words after five minutes. (Tr. 628-

5

29). He added by threes to 40, and subtracted sevens from 100 slowly. (Tr. 629). Claimant's scores

on the Wechsler Memory Scale IV varied from borderline to average; he worked slowly and Dr.

Wax noted his scores indicated possible organic problems and/or a learning disorder. *Id.*

Claimant also underwent a physical consultative examination with Joshua Natali, D.O., in

March 2018. (Tr. 634-38). Dr. Natali observed Claimant was alert, with good eye contact, fluent

speech, appropriate mood, and clear thought processes. (Tr. 636). He observed Claimant's

"memory was normal and concentration was good." *Id.*

Also in March 2018, Claimant underwent a neurological evaluation due to his memory

problems. (Tr. 805). He reported difficulty multitasking, difficulty finishing tasks, and

forgetfulness. *Id.* He, however, was working on his RV and able to "use tools appropriately and

finish tasks"; he had recently been on vacation in his RV. *Id.* On examination, his attention, recent

and remote memory, and language function were normal, but his mood was depressed. (Tr. 807-

08). Dr. Jagan Pillai, M.D., assessed "[s]ubjective memory complaints with working memory

deficits", but noted Claimant was independent in his activities of daily living. (Tr. 809). He

suggested a change in depression medication in light of Claimant's cognitive symptoms, a sleep

evaluation, decreased use of Percocet at night, and lab work. *Id.* He counseled Claimant on tasks

to improve working memory including good sleep hygiene, learning a new skill, cognitive

exercises, physical exercise, and having a structured daily routine. *Id.*

In April, Claimant returned to the Mellen Center. (Tr. 827-32). The physician noted a brain

MRI earlier that month was "stable with resolution of optic nerve enhancement". (Tr. 827).

Claimant reported a worsening of his vision at night, but it was stable during the day. (Tr. 828).

He had developed sporadic leg tremors and cramping in his hands and feet, as well as significant

fatigue. *Id.* On examination, the physician observed normal language, memory, affect, and

6

intellectual function. (Tr. 830). Claimant's examination was "stable" and the physician again noted his risk of MS remained low. (Tr. 832). She instructed him to follow up with ophthalmology regarding his vision issues, follow up with his primary care provider regarding thyroid issues, and follow up with her in six months (sooner if his fatigue and shaking did not improve with thyroid treatment). (Tr. 832).

Claimant saw his primary care provider in July 2018 and was prescribed thyroid medication for his hypothyroidism. (Tr. 890). Later that month, he returned to the Mellen Center to discuss continued tremors, poor balance, and fatigue. (Tr. 898). He described worsening tremors in his hands, and throughout his entire body. *Id.* Ativan only helped somewhat. *Id.* Providers noted there was "no suggestion of a cognitive or memory disturbance evidence during the examination, although formal testing not completed today." (Tr. 899). He had a normal affect and did not appear depressed. *Id.* Providers assessed optic neuropathy and again noted he did not meet the diagnostic criteria for MS. (Tr. 900). They noted they would consult with an endocrinologist regarding Claimant's tremors. *Id.*

In October, Claimant returned to the Mellen Center reporting neck pains, headaches, and an intermittent rash. (Tr. 942). The physician again repeated there was no evidence of a cognitive or memory disturbance, and that Claimant had a normal affect and did not appear depressed. (Tr. 945). She prescribed medication, referred Claimant for a consultation regarding his headaches, ordered lab work, and instructed Claimant to follow up with endocrinology. (Tr. 946).

*Opinion Evidence*

After her November 2017 consultative examination, Dr. Alouani offered an opinion regarding Claimant's mental functional ability. (Tr. 621). First, she noted Claimant's cognitive abilities were in the average to low-average range and he "appeared to have no difficulty

understanding, remembering, or carrying out instructions throughout the evaluation." *Id.* Second, she noted he self-reported "some mild difficulties with attention and concentration" but his mental status examination "indicated no difficulties with his attention and concentration." *Id.* She further noted he had some difficulty with remembering names and losing track of where he was during the interview. *Id.* Third, she noted Claimant had no trouble with supervision or authority figures and had previously maintained significant periods of employment. *Id.* Finally, she noted Claimant "appear[ed] to have limited skills to manage work-related pressures currently", but "did evidence an ability to manage work-related pressures successfully in the past as evidenced by his two periods of employment for ten years and nine years". *Id.* She concluded that he "may have the capacity to learn additional coping skills in mental health treatment as his symptoms get better." *Id.*

In November 2017, State agency physician Leslie Rudy, Ph.D., reviewed Claimant's medical records and offered a mental residual functional capacity. (Tr. 105-06). Therein, she opined Claimant was moderately limited in the ability to maintain attention and concentration for extended periods, and moderately limited in the ability to complete a normal workday and workweek without interruptions from psychological symptoms and to perform at a consistent pace. (Tr. 106). She explained that Claimant "endorses decreased energy and difficulty with confusion" and at the consultative examination "had difficulty keeping his train of thought and remembering names." *Id.* She noted he reported being able to drive and manage finances, and opined that he was "able to carry out a wide variety of tasks in a setting without demands for fast pace or high production." *Id.*

After the March 2018 consultative examination, Dr. Wax also offered a mental functioning opinion. (Tr. 630-31). He opined Claimant would be unable to understand, remember, and carry

out instructions "based upon his functioning during today's evaluation", would have difficulty maintaining attention and concentration due to his MS, would not have difficulty responding appropriately to supervisors and coworkers, and would not respond appropriately to work pressures "due to his depression and physical problems". (Tr. 630-31).

Later in March 2018, state agency reviewing physician Patricia Kirwin, Ph.D., reviewed Claimant's records and offered a mental residual functional capacity opinion. (Tr. 123-24). She opined Claimant was moderately limited in the ability to understand and remember detailed instructions, stating he could understand simple, routine tasks of one to three steps. (Tr. 123). She further found Claimant moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions or perform at a consistent pace. (Tr. 124). Like Dr. Rudy, she opined Claimant was "able to carry out a wide variety of tasks in a setting without demands for fast pace or high production." *Id.* Finally, she opined Claimant was moderately limited in his ability to respond appropriately to changes in the work setting or set realistic goals or make plans independently. *Id.* She explained that he "retain[ed] the ability to complete tasks in an environment in which changes are occasional and explained in advance" but would "need major changes to a preset routine previewed and gradually introduced to allow time to adjust to the new expectations." *Id.* Dr. Kirwin explained that the second consultative examiner's opinion was "far more impairing and . . . inconsistent with the testing at that [examination] and not supported by this and other [medical evidence of record]." *Id.*

VE Testimony

A VE testified at the hearing before the ALJ. (Tr. 84-89). The ALJ asked the VE to consider a hypothetical individual with Claimant's age, education, work experience, and residual functional

capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 86-87. The VE responded that such an individual could not perform Claimant's past work, but could perform other jobs such as merchandise marker, cashier II, and bench assembler. (Tr. 87). The VE further stated if the individual were off task twenty percent of the workday, absent more than one day per month, no jobs would be available. (Tr. 88-89). Further, if Claimant's ability to stand and walk were limited to three hours of an eight-hour workday, the VE testified the previously-identified jobs would not be available. (Tr. 89).

ALJ Decision

In his March 2019 decision, the ALJ found Claimant met the insured status requirements of the Social Security Act through December 21, 2022 and had not engaged in substantial gainful activity since his July 1, 2017 alleged onset date. (Tr. 18). He found Claimant had severe impairments (prior to his death) of optic neuropathy of right eye, osteoarthritis of left shoulder, status post rotator cuff repair, osteoarthritis of left knee, and depressive disorder with diminished cognition. (Tr. 18). He found, however, that none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment. (Tr. 19). Thereafter, the ALJ set forth Claimant's RFC:

> [P]rior to his death, the claimant had the residual functional capacity (20 CFR 404.1545) to perform light work as defined in 20 CFR 404.1567(b), except: he could never climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs; could occasionally balance, stoop, kneel, crouch and crawl; could occasionally perform overhead reaching with the left shoulder, without limitation of the right shoulder; he could not be exposed to hazards (heights, machinery, commercial driving); and mentally, he could perform simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) (20 CFR 404.1569a).

(Tr. 21). The ALJ then determined Claimant was unable to perform any past relevant work, but considering his age, education, work experience, and RFC, there were jobs that exist in significant

numbers in the national economy that he could have performed. (Tr. 28). Therefore, the ALJ found

Claimant was not disabled from his alleged onset date through the date of his death. (Tr. 29).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*,

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or

indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a),

1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's residual functional capacity and can claimant perform past relevant work?

5.   Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises two objections to the ALJ's decision. First, she contends the ALJ's evaluation of Dr. Wax's consultative opinion lacks the support of substantial evidence. Within this argument, Plaintiff also argues Claimant's symptoms may have been caused by the later-discovered adrenal tumor and the ALJ could have called an oncologist as a medical expert. Second, Plaintiff contends the ALJ failed to properly evaluate Claimant's symptoms in accordance with

12

Social Security Ruling 16-3p, but instead offered only a boilerplate analysis. For the reasons discussed below, the undersigned recommends the Court affirm the Commissioner's decision.

<u>Dr. Wax's Opinion</u>

Plaintiff first contends the ALJ's rationale for discounting Dr. Wax's consultative opinion is unsupported. (Doc. 12, at 9-13). For the reasons discussed below, the undersigned finds no error.

The RFC finding is the ALJ's ultimate determination of what a claimant can still do despite his physical and mental limitations. 20 C.F.R. §§ 404.1545(a), 404.1546(c). The ALJ makes this finding based on a consideration of medical source statements and all other evidence in the case record. 20 C.F.R. §§ 404.1529, 404.1545(a)(3), 404.1546(c). Thus, in making the RFC determination, and ALJ must necessarily evaluate the persuasiveness of the medical source statements in the record and assess the claimant's subjective allegations. *See* 20 C.F.R. §§ 404.1520c, 404.1529(a).

The new regulations for evaluating medical opinions apply to Claimant's case because he filed his application after March 27, 2017. *See* 20 C.F.R. §§ 404.1520c, 416.920c. The new regulations eliminate the well-known "treating physician rule" and explicitly state the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the record, even if it comes from a treating medical source. 20 C.F.R. § 404.1520c(a). Instead, ALJs must now evaluate the "persuasiveness" of all medical opinions using the five factors listed in paragraphs (c)(1) through (c)(5). 20 C.F.R. §§ 404.1520c(a) and (b). These five factors are supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 404.1520c(c)(1)-(5). Of these factors, the two most important are supportability and consistency. 20 C.F.R. §§ 404.1520c(a) and (b)(2). The regulations require ALJs to explain how they considered the supportability and consistency factors in determining the

persuasiveness of the medical source's opinion. 20 C.F.R. § 404.1520c(b)(2). Notably, ALJs

"may, but are not required to, explain how" they considered the three other factors in determining

the persuasiveness of the medical source's opinion. *Id.*

> The ALJ addressed Dr. Wax's opinion as follows:
>
> Mitchell Wax, Ph.D., performed a consultative psychological evaluation on March 5, 2018. (Exhibit 7F). On examination, [claimant] was a pleasant man who walked with an unsteady gait. He made little eye contact and one of his eyes was often half shut. He complained of vision problems. His speech was at times logical, coherent and goal directed, and at other times, he struggled for memory when responding to questions. He appeared content, but at times he appeared anxious. He denied suicidal or homicidal ideations. He reported no problems with irritability or anger. He reported his appetite was poor, but his weight was stable. He reported sleep difficulty. He was oriented to person, place, time and situation. There was evidence of mental confusion as he intermittently struggled for memory. The claimant was administered the Wechsler Adult Intelligence IV (WAIS-IV) and achieved a full-scale IQ of 89. He was diagnosed with a cognitive disorder as a result of MS and depressive disorder. Dr. Wax opined the claimant would not be able to understand, remember and carry out instructions on a job based upon his functioning during the evaluation. He had difficulty following television programs. He would have difficulty maintaining attention and concentration on a job due to his MS. He would not have difficulty responding appropriately to supervisors and coworkers in a work setting. He would not respond appropriately to work pressures in a work setting due to his depression and physical problems. The undersigned found this opinion less persuasive because the limitations are far more impairing and they are inconsistent with the testing and the medical evidence of record.

(Tr. 26).

The ALJ's analysis satisfies the above-cited regulations as it addresses the supportability

and consistency of Dr. Wax's opinion. First, the ALJ noted Dr. Wax's opinion was "inconsistent

with the testing". (Tr. 26). The undersigned agrees with the Commissioner that, in context, it is

sufficiently clear that the ALJ was referring to the testing Dr. Wax performed at his consultative

examination.[3] In his summary of Dr. Wax's evaluation and opinion, the ALJ noted Claimant had

---

3. Two reasons support this reading. First, prior to this statement (and in the same paragraph), the ALJ summarized Dr. Wax's administration of the Wechsler Adult Intelligence IV test. (Tr. 26). Second, as the Commissioner points out, the ALJ's language tracks that of the second state agency

a full-scale IQ of 89 and that Dr. Wax observed Claimant "at times . . . struggled for memory when responding to questions" and "intermittently struggled for memory." (Tr. 26); *see* Tr. 628-29. Moreover, in addition to these notes, Dr. Wax's testing itself indicated Claimant could recall six digits forward and four digits backward, could remember two of three words after five minutes, and could add by threes to 40 and subtract by sevens from 100 (though slowly). (Tr. 628-29). Dr. Wax also found Claimant scored "in the borderline range" on delayed memory, and "in the average range" on visual working memory. (Tr. 629). The undersigned finds ALJ's determination that the limitations Dr. Wax offered – including a complete inability to understand, remember, and carry out instructions – were "far more impairing and . . . inconsistent" with this testing is supported by substantial evidence. (Tr. 26).

Second, the ALJ noted Dr. Wax's opinion was inconsistent with the medical evidence of record. (Tr. 26). Plaintiff is correct the ALJ was not specific when explicitly addressing Dr. Wax's opinion. However, the undersigned finds the ALJ's decision as a whole, which discusses the medical evidence of record, supports this conclusion. *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) ("When viewed as a whole, however, the ALJ's decision shows that she indeed weighed all of the mental-health opinions presented to her.")*; Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (ALJ not required to include his explanation "within a single paragraph," and the court will "read the ALJ's decision as a whole and with common sense"). At Step Two, in analyzing Claimant's mental impairments, the ALJ explicitly compared his subjective allegations with contrary evidence in the record. *See* Tr. 19-20. For example, in contrast to Claimant's subjective allegations that he had difficulty remembering,

---

reviewing physician, Dr. Kirwin, who explained that the Dr. Wax's opinion was "far more impairing and . . . inconsistent with the testing at that [examination] and not supported by this and other [medical evidence of record]." (Tr. 124).

understanding, and following instructions, as well as completing tasks, the ALJ noted: (1) Claimant "also stated that he could prepare meals, pay bills, shop, and drive"; (2) "the claimant was able to provide information about his health, describe his prior work history, respond to questions from medical providers, and there is [not] any mention of any issues with the claimant's short- or long-term memory." (Tr. 20). This is supported by the record. *See* Tr. 618 (Claimant's report to Dr. Alouani that he was able to perform personal care tasks, cook, clean, do laundry, shop, manage money, and drive); Tr. 314, 316, 325, 471, 830 (normal memory); Tr. 619 ("[r]ecent and remote memory skills . . . intact"); Tr. 805 (working on his RV and able to "use tools appropriately and finish tasks"); Tr. 807-08 (recent and remote memory normal, and impression of no memory deficit); Tr. 899, 945 ("no suggestion of cognitive or memory disturbance evidence during this examination").

Further, in response to Claimant's subjective contentions regarding concentration difficulties, the ALJ cited: (1) Claimant's statements "that he was able to drive, prepare meals, watch TV, manage funds, and use the internet"; and (2) "the record failed to show any mention of distractibility." (Tr. 20). This, again, is supported by the record. *See* Tr. 616-18 (Claimant's report that he could perform personal care tasks, cook, clean, do laundry, shop, manage money, watch television, and drive); Tr. 635 (Claimant's report that his typical daily activities consisted of housecleaning and laundry); Tr. 325 (normal attention and concentration); Tr. 619 ("[a]ttention and concentration were intact"); Tr. 807 ("[n]ormal" attention); *see also* Tr. 899, 945 ("no suggestion of cognitive or memory disturbance evidence during this examination").

The ALJ also elsewhere accurately summarized Dr. Alouani's evaluation in which she found Claimant had intact attention and concentration, and Dr. Natali's observations regarding memory and concentration. *See* Tr. 25-26; *see also* Tr. 619 (Dr. Alouani's findings of intact

16

memory, intact attention and concentration, and "mild difficulty with attention and concentration for more complex tasks"); Tr. 636 (Dr. Natali's observation that Claimant's memory was normal and concentration was good). These discussions elsewhere in the ALJ's opinion (and in the record) suffice to support his determination that Dr. Wax's opinion was "inconsistent with . . . the medical evidence of record." (Tr. 26).

The ALJ thus followed the above-cited regulations in finding Dr. Wax's opinion – which stated Claimant would be unable to understand, remember, and carry out instructions and "have difficulty" maintaining attention and concentration (Tr. 629) – less persuasive. He explicitly addressed the consistency and supportability of that opinion as required. 20 C.F.R. § 404.1520c(b)(2).

Failure to Consult Oncologist

 Plaintiff additionally contends "as Claimant's tumor was never discovered when he was living, it is unclear if these symptoms resulted from the tumor itself" and it "may have been wise to consult an oncologist regarding these issues." (Doc. 12, at 12-13). Plaintiff, however, stops short of arguing the ALJ was required to do so. This is likely because, as the Commissioner correctly points out, discretion rests with the ALJ to determine if additional evidence is necessary. *See* 20 C.F.R. § 404.1513a (ALJs "*may* also ask for medical evidence from expert medical sources") (emphasis added); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). The ALJ questioned Plaintiff and counsel extensively at the hearing regarding whether there was any evidence of the tumor pre-dating Plaintiff's death.[4] *See* Tr. 63-67, 70-71, 73-79, 82-84, 90-94. At the hearing, the ALJ noted Claimant had a normal EKG in May 2018 (six months prior to his death). (Tr. 76)

---

4. As the ALJ recognized (*see* Tr. 27-28), the relevant regulations provide that to be disabling, an impairment must be "expected to result in death" or meet a duration requirement. 20 C.F.R. § 404.1509.

(referring to Tr. 704). Additionally, as the Commissioner points out, an April 2018 abdominal CT scan (seven months prior to Claimant's death) showed no adrenal masses. (Tr. 1034). Thus, the ALJ reasonably determined he could not determine the tumor existed, much less caused Claimant's allegedly disabling symptoms for the required time period. *See* Tr. 27-28 ("[T]he length of time that this tumor existed could not be ascertained.").[5]

Subjective Symptoms

Plaintiff next contends the ALJ's evaluation of Claimant's symptoms was insufficient. She argues generally the ALJ provided boilerplate language and the ALJ's "failure to provide any explanation for why she discounted [Claimant's] subjective symptoms within the decision warrants remand for further proceedings." (Doc. 12, at 15). She does not point to any specific symptom the ALJ failed to consider or any specific limitation based thereon that the ALJ failed to include in the RFC. *See id.* at 13-15. Her Reply is no more specific. *See* Doc. 15, at 2-3.

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *see also Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("[H]armless error applies to credibility determinations in the social security disability context."). Plaintiff has failed to point to anything specifically harmful about the ALJ's subjective symptoms analysis and this argument could be denied on that ground alone. However, the Commissioner addresses the argument, so the undersigned will do so as well.

In considering symptoms, an ALJ follows the two-step process prescribed by regulation. An ALJ must first determine whether there is an underlying medically determinable impairment

---

5. The ALJ informed Plaintiff that should the autopsy results reveal anything further about how long the tumor existed, she could file a request for reopening. (Tr. 90-92).

that could reasonably be expected to produce the claimant's alleged symptoms; second, if such an impairment exists, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms on the claimant's ability to do basic work activities. 20 C.F.R. § 404.1529(a). In making this determination and considering whether a claimant has disabling pain, an ALJ must consider: (1) daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, to relieve pain; and (6) any other measures used to relieve pain. 20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p, 2017 WL 5180304. Although the ALJ must "consider" the listed factors, there is no requirement that he discuss each one. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. The Sixth Circuit has explained, interpreting SSR 96-7p, the precursor ruling, that a credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and such a determination is "virtually unchallengeable", *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal quotation omitted). The Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence. *See Ulman*, 693 F.3d at 713-14 ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]"). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

19

The undersigned finds the ALJ's decision complies with SSR 16-3p and explains his reasoning for partially discounting Claimant's subjectively reported symptoms. The ALJ accurately set forth the two-step process, and then stated:

> The claimant's statements regarding his impairments and their ability to work are not entirely consistent with the evidence in light of the reports of the objective evidence of record. While the claimant had impairments that could be expected to produce some discomfort and functional limitations, the objective evidence did not support his contentions regarding the severity, chronicity and/or frequency of his symptoms.

(Tr. 22).

In *Cox v. Commissioner of Social Security*, the Sixth Circuit explained that other Circuit Courts have criticized boilerplate credibility findings, "finding the language unhelpful". 615 F. App'x 254, 260 (6th Cir. 2015). The court's "chief concern with the popularity of this template, however, is the risk that an ALJ will mistakenly believe it sufficient to *explain* a credibility finding, as opposed to merely introducing or summarizing one." *Id.* (emphasis in original). However, here, contrary to Plaintiff's contention that "the ALJ fails to give any explanation . . . which could be construed as an explanation of his credibility finding" (Doc. 12, at 14), the undersigned finds the ALJ did so in several places. First, as discussed above, the ALJ compared Claimant's subjectively-reported mental symptoms to other evidence of record at Step Two, noting these were somewhat inconsistent with the record – both in Claimant's daily activities and in the objective medical evidence – demonstrating lesser restrictions. *See* Tr. 19-20. As discussed above, this analysis is supported by substantial evidence. Further, "inconsistencies in the objective medical evidence is one of the many factors [an ALJ] must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *5. And, the ALJ's analysis in this regard appropriately considers Claimant's daily activities and abilities, pointing out how they are inconsistent with his alleged mental functioning. (Tr. 19-20); *see* 20

20

C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *7. In this analysis, the ALJ also noted the State agency psychological consultants who reviewed the record found Claimant had no more than moderate restrictions in mental functioning. *See id.*; Tr. 105-06, 123-24. Additionally, the ALJ described the opinion evidence in detail, explaining which opinions he found more or less persuasive. (Tr. 25-27). Finally, after his explanation of the evidence as a whole, the ALJ discussed several factors relevant to symptom analysis, summarizing that:

> The claimant's allegations are partially consistent with respect to the nature of his symptoms. However, his allegations that his symptoms are so severe that he could not perform work at substantial gainful activity levels was not consistent in light of the evidence of record and activities consistent with the ability to perform a range of light work.

(Tr. 27). The ALJ further noted that "[n]o treating source referred to the claimant as having incapacitating or debilitating symptoms that would prevent him from returning to the workplace at a reduced level of exertion such as in the performance of light work, or had otherwise described the claimant as 'totally and permanently disabled' by his impairments and complaints." *Id.*

Although the ALJ did not find Claimant was as limited as he alleged, he did impose significant restrictions – both physical and mental – on Claimant's ability to work. *See* Tr. 21. Read as a whole, the ALJ's decision adequately explains the basis of his subjective symptom evaluation, which is entitled to great weight and deference. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004). Although Plaintiff can point to evidence to support a contrary conclusion, this Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The undersigned finds no "compelling reason", to disturb the ALJ's subjective symptom evaluation. *Smith*, 307 F.3d at 379.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and recommends the decision be affirmed.

s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).